**EXHIBIT A TO NOTICE OF REMOVAL**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

----------------------------------------------------------------X

THOMAS C. BROOKS, JR.
                    Plaintiff

       -against-


TAILORED SHARED SERVICES, LLC
and MEN'S WEARHOUSE
                 Defendants

----------------------------------------------------------------X

Index No.: 584/23
Plaintiff designates
Kings County as the
place of trial.

The basis of the venue is
Plaintiff's residence

SUMMONS WITH VERIFIED
COMPLAINT

To the above-named defendants:

**YOU ARE HEREBY SUMMONED** to serve a notice of appearance on the Plaintiff

within 20 days after the service of this Summons, exclusive of the day of service (or within 30

days after service is completed if this summons is not personally delivered to you within the

State of New York); and in case of your failure to appear, judgment will be taken against you by

default for the relief demanded in the complaint.


Dated: November 14, 2023

                                      Thomas C. Brooks, Jr.
                                      Pro se Plaintiff
                                      10558 Avenue M, #2
                                      Brooklyn, NY 11236

**EXHIBIT A TO NOTICE OF REMOVAL**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
---------------------------------------------------------------X

THOMAS C. BROOKS, JR,

Plaintiff,

Index No. <em>884/23</em>

COMPLAINT

TAILORD SHARED SERVICES, LLC
and MEN'S WEARHOUSE,

Defendants,

---------------------------------------------------------------X

The Plaintiff, proceeding *pro se*, under the penalties and pains of perjury, complains of the defendants named above and alleges the following:

Summary of causes of action: Breach of Contract; Quantum meruit / Failure to Compensate; Constructive Termination / Forced Resignation; Intentional Infliction of Emotional Distress.

1. That the plaintiff is a suspended attorney, residing at 10558 Avneue M, #2 Brooklyn NY 11236, working for Tailored Brands, Inc., as a "Wardrobe Consultant" in its Men's Wearhouse stores located in the State and City of New York.

2. That the defendant Tailored Brands is an omnichannel retailor with headquarters located at 6380 Rogerdale Road, Houston TX 77072, and is the parent company of Men's Wearhouse.

1

**EXHIBIT A TO NOTICE OF REMOVAL**

3. That the defendant Men's Wearhouse is a men's clothing retailer with stores all across the United States, including store 5470 located at 135 W 50th Street, New York, New York, 10020.

4. That the plaintiff was hired by Men's Wearhouse on March 1, 2016 as a full time Wardrobe Consultant at $6.00 per hour plus commissions.

5. That as a Wardrobe Consultant, the plaintiff's job was to assist customers in all aspects of purchasing wardrobe items from the company's retail and custom inventory. Wardrobe Consultants were also expected to help the rental department with measurements.

6. That after working in several stores, prior to 2019, the plaintiff was promoted to "third key holder" at $7.00 per hour plus commissions.

7. That as a "third key holder," the plaintiff's job was the same as before, with the addition of; opening / closing the store; processing returns; and transferring items to different stores.

8. That as a "third key holder," the plaintiff was never responsible for managing or supervising other employees.

**EXHIBIT A TO NOTICE OF REMOVAL**

9. That pursuant to the COVID 19 pandemic shut-down, the plaintiff was laid-off and caused to go on unemployment until about June 29, 2020.

## FRAUD IN THE INDUCEMENT / BREACH OF CONTRACT

10. That the plaintiff received a call from regional manager Jimmy Verga at the end of June 2020, asking the plaintiff to return to work for an increased hourly rate, plus a share of a pooled commission.

11. That Verga explained in brief that the shared commission would be based upon the number of hours worked, but that other than that, the details had not yet been finalized.

12. That the plaintiff was dissuaded from negotiating a higher hourly rate by the promise of a pooled commission, which had the effect of preserving the culture of "your raise is in the rack."

13. That Verga explained in that phone call, that except for the manager, the plaintiff was being called back along with a few other individuals in a scaled down crew, and that "everyone would be expected to do everything."

14. That upon information and belief, the several other Wardrobe Consultants who were not called back, were offered severance packages.

**EXHIBIT A TO NOTICE OF REMOVAL**

15. That after the pooled commission never materialized, plaintiff sent an email to Jimmy Verga on July 5, 2021, copying the management team, requesting an update on the status of the pooled commissions. That email is attached hereto as **Exhibit A**.

16. That although Verga did not deny having promised a pooled commission, he responded via email on July 7, 2021 that "there is not a plan to put a pooled commission in place." See email attached hereto as **Exhibit B**.

17. That on June 1, 2022, the plaintiff wrote a long email complaining about being forced into the role of "wedding consultant," and other harassment from the manager, attached hereto as **Exhibit C**.

18. That the next day on June 2, 2022 plaintiff wrote another email complaining about how the new system without commissions or the "up-system" was basically bad for business, and that plaintiff was getting increasingly frustrated with carrying an inordinate share of the work burden. See attached hereto as **Exhibit D**.

19. That in or about June 2022, Jimmy Verga came to store 5470 to address the emails and various complaints that plaintiff had raised.

20. That Jimmy Verga's response was that plaintiff was "living in the past" regarding commissions, and that plaintiff's only choices were to "get on board or be fired."

**EXHIBIT A TO NOTICE OF REMOVAL**

21. That at that meeting, in or about June 2022, Jimmy Verga took issue with the fact that plaintiff admitted to "hating weddings."

22. That Jimmy Verga did not address any of the incidents of harassment or other concerns raised in plaintiff's emails.

23. That the next month, in retaliation for complaining about weddings, plaintiff was given the "division of responsibilities" (DOR) that put him in charge of all things related to weddings and rentals.

24. That the plaintiff understood the assignment was designed to frustrate him into quitting, but completed the six (6) month assignment without issue, maintaining a professional standard and meeting all of the requirements. See email attached hereto as **Exhibit E**.

25. That the plaintiff related all of his frustrations to Greg Kinnison in Human Resources to no avail. See email trail between Kinnison and plaintiff attached hereto as **Exhibit F**.

26. That the plaintiff received a first write up for "not supporting the team" in or about July 2022.

27. That during the process of that first write-up, the plaintiff got frustrated that the management was not backing the plaintiff up, and walked out of the meeting.

**EXHIBIT A TO NOTICE OF REMOVAL**

28. That Jimmy Verga and James Mosely took the plaintiff outside the store, where Jimmy Verga told the plaintiff that he "would have fired him by now," if it were up to him.

29. That Jimmy Verga offered the plaintiff the option of taking the rest of that day off, to which the plaintiff refused and returned to work.

## QUANTUM MERUIT / FAILURE TO COMPENSATE

30. That the defendants have never compensated the plaintiff for managing or supervising other employees.

31. That the plaintiff was hired to sell men's clothing for commission.

32. That in or about June 2022 the defendants adopted a new management system based upon dividing divisions of responsibility (DOR) between a management staff of four (4) individuals on a six (6) month rotating basis.

33. That under the DOR, the management team was expected to delegate work tasks to a staff of temporary workers.

34. That the plaintiff was conscripted into a management capacity without any discussion of a commensurate raise in compensation for the additional duties and responsibilities.

**EXHIBIT A TO NOTICE OF REMOVAL**

35. That the plaintiff complained several times to the manager James Mosely about having to manage other employees without any raise in compensation.

36. That the manager James Mosely made it clear that any step back from management / supervisory duties would be met with some reduction in hourly pay.

## CONSTRUCTIVE TERMINATION

37. That as the traffic continued to increase back to pre-pandemic levels, Men's Wearhouse began to hire part-time workers, many with the type of work ethic which requires constant supervision.

38. That being accountable for a DOR requires delegation of many duties to other employees.

39. That plaintiff had already been forbidden from delegating to other employees, for no articulable reason.

40. That upon information and belief, the manager James Mosely shared the contents of plaintiff's emails with employees who were not management, and who were not otherwise privy to the information.

41. That after the emails, the manager James Mosely ceased greeting the plaintiff regularly in the store, and began a campaign of isolation which extended to other employees, so that

**EXHIBIT A TO NOTICE OF REMOVAL**

there were several employees in the store who generally did not communicate with the plaintiff.

42. That the manager James Mosely would make a regular spectacle of greeting every employee in the store with hugs and handshakes before looking over at the plaintiff and saying, "what up dude."

43. That it was obvious to every employee in the store that the Manager does not like the plaintiff.

44. That there was a Sunday in or about June 2022, (prior to plaintiff being denied the authority to delegate) when the plaintiff, along with co-worker Hany Elgazzar, decided to work the DOR "to the letter," which required delegating work to other employees.

45. That that Sunday was the most successful Sunday in store 5470 since up to that point.

46. That although the staff reluctantly responded to the delegations, there was obvious push back and questioning of the "audacity" to delegate.

47. That the staff in 5470 was notoriously "anti-customer," since the extinguishing of sales commissions, and would play the game of "not it," whenever customers walked into the doors.

**EXHIBIT A TO NOTICE OF REMOVAL**

48. That when customers asked questions to the staff, they would hesitate to answer, under the belief that whoever responded to the customer had to help the customer.

49. That Men's Wearhouse otherwise refused to support the "up system" after the extinguishing of commissions.

50. That upon information and belief, several members of the staff "complained" to the Manager that plaintiff was delegating work to them.

51. That in a private meeting with the Manager James Mosely, and the assistant store manager John Rogers, in or about June 2022, Mosely stated to the plaintiff that "you think they like you, but they are only tolerating you," about the other employees in the store.

52. That at that private meeting the assistant manager kept repeating how the "staff has to feel as if you would save them from a burning building," before they would be comfortable taking delegations from you.

53. That the plaintiff challenged the assistant manager that they had worked together before, and that he had raised no issues, asked no questions, and had not given any instructions regarding the manner of plaintiff's delegating nor any other aspect of plaintiff's work.

**EXHIBIT A TO NOTICE OF REMOVAL**

54. That at that meeting, in or about June 2022, the manager James Mosely made it clear that the plaintiff was not to delegate any work to any other employee.

55. That the manager finally assigned plaintiff to the DOR specific to the "customer experience," in the store, which previously was owned by Hany Elgazzar.

56. That when Hany Elgazzar owned the "customer experience" DOR, he was not responsible for cleaning the bathrooms.

57. That for years the manager James Mosely had threatened to create a bathroom cleaning schedule, so that the store could share that responsibility evenly, but he failed to do so.

58. That the manager generally depended upon an employee (Bert Plummer) who was not as good with the iPad or other technological aspects of the job, and who mainly did cleaning, to clean the bathrooms.

59. That the plaintiff has voluntarily cleaned the bathrooms when it was necessary, and at the request of the manager.

60. That when the plaintiff took over the DOR related to the "customer experience," the manager portended that cleaning the bathrooms was part of that DOR, when it is not.

**EXHIBIT A TO NOTICE OF REMOVAL**

61. That if cleaning the bathrooms is part of the DOR to which the plaintiff is assigned, and the plaintiff is restricted from delegating work to other employees, it means that the plaintiff has to clean the bathrooms every day himself.

62. That when the plaintiff had the "business operations" DOR, which required filing all of the paperwork from the rentals, the plaintiff had to file them all himself, without the help of any other employee.

63. That when the plaintiff was assigned the "business operations" DOR, the paperwork had not been filed in over two years, and there were documents containing the customers' sensitive information stuffed into virtually every drawer in the store.

64. That the plaintiff took 2-3 days to file all of that paperwork by himself, and discarded a huge garbage can full of such documents where the event dates had been expired by at least six (6) months.

65. That instead of thanking the plaintiff for cleaning up the files and making them functional, the manager only complained about old files that had been discarded.

66. That for the entire six (6) months that the plaintiff had the "business operations" DOR, he filed every single piece of paperwork himself, and kept them filed weekly without any help from staff.

**EXHIBIT A TO NOTICE OF REMOVAL**

67. That when the manager later took over the "business operations" DOR himself, he had at least two staff members assist in filing the daily paperwork.

68. That the manager sent the plaintiff a text message on September 17, 2023, ordering the plaintiff to (1) clean the bathroom; (2) size / organize clearance racks; (3) dust all surfaces, attached hereto as **Exhibit G,** all of which was completed by the plaintiff.

69. That prior to sending that text message, the manager had never mentioned that the plaintiff was in an any way responsible for cleaning the restrooms.

70. That the plaintiff cleaned the bathroom while Hany Elgazzar sized the clearance racks, and other employees did the dusting.

71. That although the plaintiff was off the next day (Monday), when the plaintiff came in to work on Tuesday, the Manager was complaining that the plaintiff "did not clean the bathroom," to which the plaintiff responded that he had.

72. That the Manager eventually wrote the plaintiff up for not cleaning the bathroom, and threatened to revisit the writeup in 30 days to see if there was "improvement."

73. That for years in store 5470 the plaintiff carried the burden of custom sales, while the manager remained negative about the program, and was reluctant to push custom sales.

EXHIBIT A TO NOTICE OF REMOVAL

74. That the plaintiff regularly complained that he ought not be the only person selling custom, particularly when all of our financial fates (bonuses / pooled commissions) are dependent upon everyone selling.

75. That there were frequent incidents where the plaintiff complained about customers being sent away, because there was no one available in the store who could sell the custom merchandise.

76. That even the store assistant manager who, upon information and belief, makes at least $6.00 more per hour than the plaintiff cannot sell the custom merchandise, and has sent customers away, "until the custom guy gets here."

77. That the manager has never written anyone up for not being able to sell custom, or for sending customers away.

78. That because of the retaliation and hostility in the workplace, the plaintiff submitted a resignation under duress, attached hereto as **Exhibit H**.

## RETALIATION / INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

79. That the manager James Mosely began this campaign to get the plaintiff to resign in retaliation for the plaintiff writing emails complaining about harassment by the manager; and the direction employee motivation has gone since the extinguishing of commissions.

**EXHIBIT A TO NOTICE OF REMOVAL**

80. That the manager James Mosely sought to downgrade the plaintiff's work situation, and to otherwise humiliate the plaintiff for writing the emails.

81. That the manager James Mosely is aware that the plaintiff is was only working at Men's Wearhouse, because of a fraud being carried out by his ex-wife which is keeping his license to practice law under suspension.

82. That the plaintiff has confided in the Manager James Mosely, that the plaintiff suffered from mental depression, and that plaintiff's depression was exacerbated by the fraud which caused the plaintiff to work at Men's Wearhouse.

83. That the case (3182/17) which is nearing its end in the Kings County Supreme Court has been a great source of mental depression.

84. That outside of the one time that the plaintiff avoided taking a customer from another employee (see Exhibit C), the Plaintiff has been professional, friendly, and has never had any argument or unpleasant interaction with any other employee in store 5470.

85. That no employee in store 5470 has ever come to the plaintiff with any issue or problem regarding working with the plaintiff.

**EXHIBIT A TO NOTICE OF REMOVAL**

86. That Men's Wearhouse has largely relegated training in its stores to an iPad application known as "TLC," which employees are required to log on to everyday.

87. That the TLC program provides instructions on everything from greeting customers at the door; to renting a tuxedo; to selling retail and custom merchandise.

88. That although all employees are required to log on to TLC, the company's educational program once every day, the plaintiff, upon information and belief, has been the only employee to do so.

89. That upon information and belief, no employee in store 5740 has ever been written up for not performing a TLC.

90. That upon information and belief, there are employees who go as long as an entire week without performing a TLC, without ever being written up.

91. That the plaintiff's total points for TLC participation was always ten times (10x) that of any other employee and reflects the plaintiff's participation in the store in general.

92. That since 2016 the plaintiff has been the leader in custom sales for every store that he has worked in and is otherwise competent in all other areas of the job.

**EXHIBIT A TO NOTICE OF REMOVAL**

93. That besides the manager, as a result of his station, that there was no other employee in store 5470 who was more competent in all areas of the store than the plaintiff.

94. That there is no other reason (*res ipsa loquitur*) for any employee to stop talking to the plaintiff, other than the manager sharing confidential emails that should have been restricted to management.

95. That the fact that the manager was "icing the plaintiff out" himself, is proof that he influenced the rest of the staff to do so.

96. That the manager James Mosely only assigned the plaintiff to "business operations" when he did, because the plaintiff stated that he "hated weddings," and that the business operations DOR is accountable for all things weddings related.

97. That upon information and belief, every other Men's Wearhouse store beginning the new DOR program assigned the employee who was already the "operations manager," and accountable for weddings and rentals to the "business operations" DOR.

98. That upon information and belief, the plaintiff would have been within his rights to resign under duress after making it clear that he "hated weddings," and then being conscripted into being a "wedding consultant," particularly when there were employees trained and more qualified to be wedding consultants.

**EXHIBIT A TO NOTICE OF REMOVAL**

99. That upon information and belief, Rhea Rossi, Shaquena Davis, and Naomi DaSilva were all wedding consultants, more experienced, and otherwise qualified and trained to undertake the "business operations" DOR.

100. That when the plaintiff asked the trainer in an online training whether the "business operations" DOR was being tasked first to employees other than the Operations Managers, he laughed and confirmed that it made the most business sense to assign the Operations Manager to the business operations DOR first, since they were already familiar with the rental business.

101. That the manager James Mosely likewise only assigned the plaintiff to "bathroom duties," to humiliate the plaintiff.

102. That the manager James Mosely did not create a situation where the responsibilities for cleaning the bathrooms were evenly shared by all members of the staff.

103. That the proper DOR for the accountability of cleaning bathrooms would that regarding "store operations," which is responsible for "back-room cleaning."

104. That the store manager James Mosely has never held any "store lead" who was assigned to "store operations" accountable for cleaning the bathrooms.

**EXHIBIT A TO NOTICE OF REMOVAL**

105.    That the store manager James Mosely has never held any "store lead" who was assigned to the DOR for the "customer experience" before the plaintiff, accountable for cleaning the bathrooms.

106.    That upon information and belief, there was nothing wrong with the way that the plaintiff cleaned the bathrooms on Sunday September 17, 2023.

107.    That in the event that any aspect of any claim being brought by the plaintiff is relegated to the EEOC, the plaintiff proceeds upon an emergency basis so as to preserve plaintiff's claims, as there are no available appointments with said agency, prior to the expiration of the statute of limitations for constructive termination.

WHEREAS the Plaintiff respectfully requests that that this court enter a judgment in favor of the Plaintiff in the amount of ONE MILLION DOLLARS, and any other and further relief that this Court deems just and appropriate.

Thomas C. Brooks, Jr.
Appearing *Pro Se*
10558 Avenue M, #2
Brooklyn NY, 11236
347-782-2174

**EXHIBIT A TO NOTICE OF REMOVAL**

# Exhibits

# Exhibit A

**EXHIBIT A TO NOTICE OF REMOVAL**

Mail > Thomas.Brooks@menswearhouse.com

M: 321-505-1565
E: james.verga@tailoredbrands.com

---

**From:** Brooks, Thomas C (TCB30) <Thomas.Brooks@menswearhouse.com>
**Sent:** Monday, July 5, 2021 6:23 PM
**To:** Verga, James C (JCV3) <James.Verga@tailoredbrands.com>
**Cc:** Mosley, James A (JAM39) <James.Mosley@menswearhouse.com>; Elgazzar, Hany F (HFE2)
<Hany.Elgazzar@menswearhouse.com>; Rossi, Rhea S (RQS1) <Rhea.Rossi@menswearhouse.com>
**Subject:** Pooled Commissions?

Greetings Jimmy,

I am writing this short email to follow-up on the promise of a "pooled commission," that would be shared by the sales staff in the store. My understanding was that our compensation coming back after the pandemic last June 2020 would be a combination of an hourly salary, plus this pooled commission. I understood that the details had not been fully worked out at that time, but it has been a year, and the traffic in the store has returned to normal.

I feel as though the absence of regular commissions is detrimental toward store morale and creates a disincentive towards customer service.

Please advise.

Thomas C. Brooks
*Assistant Manager II*
**THE MEN'S WEARHOUSE**
(212)757-2676
135 W 50th St.
New York, NY
10020

EXHIBIT A TO NOTICE OF REMOVAL

Exhibit B

6/30/22, 2:59 PM                                          Mail - Thomas.Brooks@menswearhouse.com

# Re: Pooled Commissions?

## Brooks, Thomas C (TCB30)

Wed 7/7/2021 5:54 PM

To: Verga, James C (JCV3) <James.Verga@tailoredbrands.com>;

Thank you for the response. Hopefully we can find some happy medium, where the sales staff are motivated to make sales and help customers.

Thomas C. Brooks
*Assistant Manager II*
**THE MEN'S WEARHOUSE**
(212)757-2676
135 W 50th St.
New York, NY
10020

---

**From:** Verga, James C (JCV3)
**Sent:** Tuesday, July 6, 2021 9:34:22 AM
**To:** Brooks, Thomas C (TCB30)
**Subject:** RE: Pooled Commissions?

Thomas,

As of right now there is not a plan to put pooled commissions in place, however I do want to be clear on the details of our reopening.

When we initially reopened, we knew there would not be enough business to turn on the commission. Because of that, we paid a higher hourly rate than we would have. The conversation I had with each person returning was that when/if the pooled commissions were turned on that their base pay would be adjusted (lowered) and the commission would make up the difference. The idea was that we wanted everyone to make their wage in spite of traffic being soft initially. Fast forward a year, we didn't adjust wages and add commission but actually gave merit-based pay increases.

I can't tell what the future holds, but while there is no pooled commission my expectation is we give the same level of service to each customer. It's a change for all of us and I recognize that, but it is our current and possible future reality. If you would like to discuss, please call me anytime. I appreciate all you have done to help your team make it through this year.

Thank You,

Jimmy Verga
Regional Manager
New York City & Long Island (NEZI)

---

## TAILORED BRANDS

---

**EXHIBIT A TO NOTICE OF REMOVAL**

Exhibit C

June 1, 2022

**EXHIBIT A TO NOTICE OF REMOVAL**

### Your Reluctant Wedding Consultant

When I began working at Men's Wearhouse, we were on the "up system," which although imperfect, I agreed was fair and equitable. What we have devolved into post-pandemic, is something which is arbitrary and capricious, and it is being managed in a way that is resulting in mental distress to myself and potentially others.

I will begin by reporting an "incident" that occurred in the store on Friday, May 27th 2022. It was a busy morning. I had opened the store as per usual and was busy with customers from start to finish. At one point during that morning, while I was busy with two customers, I saw a customer approach our Senior Wardrobe Consultant at the back of the store, who asked the customer if he needed help. This customer was obviously not greeted at the door. He went on to explain to the Consultant that he needed "everything." He stated that he had "lost his luggage, and that he didn't have any fashion sense; that he didn't know anything about sizes or clothing whatsoever, and that he basically needed his hand held the whole way. I silently celebrated that he was NOT my customer, because I had been going non-stop since the morning, and I know the kind of energy drain that this type of customer can cause. It may have taken me another 10 or 15 minutes to finish my work with the customers that I was helping, then headed back to the front of the store.

### It is better to ask "who is at the door," than to ask "are you free?"

When I reached the front of the store, Senior Consultant asked me "are you free." This is a tricky question in a store where we have a bunch of "new generation employees" playing a game of "not it," so I responded that I was "but why?" The fact is that I am never really "free" when there are customers in the store. I am generally the most sought after Consultant working in our store. Often times I will finish with a client, take a break in the back of the store, and watch a new customer walk past four other consultants at the counter, and make a "b-line" for me standing in back of the store to ask "do you work here?" So when our Senior Consultant made it clear that she wanted me to take the customer that she had already greeted and began helping, while I was busy with other customers, I refused. I prefer to take my customers "at the door." Very shortly thereafter, I was summoned by an elderly gentleman who had clearly been sitting and waiting to be helped. When I our eyes made four, he asked "do you work here … can you help me" to which I responded "yes."

At this time, the Store Manager, who had been at the register and within earshot to heard me refusing to accept the other Consultant's customer, approached me to help that same customer. He famously favors the Senior Consultant, and appears to manage the store via texts messages between himself and the Senior Consultant, as opposed to investing confidence in the management team. At this point, I honestly do not know whether the Manager knew which customer was being referred to, or that he was reflexively (out of favoritism) siding with the other consultant. I explained that I was now with a customer, to which

1

**EXHIBIT A TO NOTICE OF REMOVAL**

he responded, "NO, I am going to help that customer ... I want you to help this other customer." So, I asked if he was referring to the customer that the other Consultant had already started with? He never responded ... but went off in a huff, (as is his custom) and greeted the customer that had just approached me, and began to help him. The store was busy enough that another customer grabbed me for help as soon as that interaction was done, and I remained busy until I clocked out at five o'clock.

It is impossible for me to be "free" in the store, whenever customers are in the store. Since we have done away with the "up system," the game has been to play "keep away" from the door, and I am always the one that the customers choose to approach. For example, as I finished with that next customer, there were at least four (4) other Wardrobe Consultants caviling about behind the register when a wedding couple walked in. Nobody was physically standing "at the door." I did not greet these customers initially, because I was busy ringing up my last customer. Since the Manager has admonished us all that we should "greet every customer," at least two consultants shouted out a "hello" from behind the counter. The couple turned around with bright smiles; responded to the greeting and began to explain that they were getting married and needed to look for a wedding suit. As they were finishing their explanation, and as I was handing my customer their merchandise, I locked eyes with these new customers and realized that the group of four behind me had wandered off, or returned to their phones, and that this new couple was focusing on me!

Under the "up system," I should never be allowed to take a customer from the register, if there is anyone else who is free. In the Staten Island store, we had a rule that forbid you from greeting a new customer while you were still ringing up another one. The rule was instituted to resolve some dispute between two consultants when everyone was "doubled up," and a new customer walked into the door; but those were the days of commissions, when consultants were running TOWARDS the door to greet customers. Today they are running away. Under this new (arbitrary and capricious) system, and with my personal acumen for customer service, I must help these customers. The alternative is to track down the four others and to demand to know "who is at the door," as they are playing "not it." Meanwhile the customer believes that I am trying to "pass the buck," and that "nobody really wants to help us."

I later had a talk with the Assistant Manager about the incident with the other Senior Consultant, and specifically about the Manager's response. I believe that the Manager was upset that I would not "lighten the load for his favorite" in that one instance; and although I had opened the store, worked hard all day, "doubling up" on customers without a break, and although the store was literally FULL of Wardrobe Consultants who were ignoring, or otherwise incompetent to help customers, I was tasked with "taking out the trash before I left at five o'clock," which I did as colleagues stood around looking at their cellphones. The Assistant Manager immediately agreed with me that we should re-institute the "up system," so that every Wardrobe Consultant takes their fair share of customers, and so that no one consultant can be arbitrarily assigned all of the "tough cases."

**It is better to say "all of our consultants can help you," than to say "we have a custom guy."**

EXHIBIT A TO NOTICE OF REMOVAL

Up until quite recently, although I have the least time/seniority in the company, I have been regarded as the "go to guy" for customs sales in the store. I laughed it off as a commissioned salesperson, but NOW when my fellow consultants' sales affects what goes into my bonuses, I feel that it is only fair that they sell the custom merchandise along with everything else. Whenever I hear "the custom guy" now, instead of taking it as a compliment, I have learned to understand it as just another "cop out" by my fellow Wardrobe Consultants get out of doing some part of the work. Another way to "beat the door." Whenever the word "custom" comes up, my name goes right with it, and all the other Consultants breathe a sigh of relief. I do not want to absolve every other consultant of their duty to learn how to sell the custom merchandise, nor do I prefer to shoulder their share of the burdens of whatever "issues" my arise with custom orders.

A couple of weeks ago when I got to the store around 11:00 AM for a closing shift, a young customer came in and stood near the door waiting to be greeted. After clocking in, I asked him if he needed any help. He responded that he had been in the store earlier to purchase a custom suit, but the "custom guy" was not in yet. My coworkers told this customer that he should go away, and to return once the "custom guy" was there. There were at least five employees in the store at the time, and all of them have taken the "TLC," on customs. All the overblown "custom guy" subterfuge in this store has created a façade of impossibility towards learning a simple task, that employees like what we are getting today learn 10 times a day! They can use a cell phone to purchase a custom suit from home on the first try because they must; but they cannot use our tablet to sell one in the store, after several months of employment, because we have not required them to.

I have even DRAGGED a few of my fellow Consultants through the process myself to avoid being the "point guy," on customs … particularly when the management team does NOT have my back! Consider the case of one recent customer (7015488) as an example:

I did a custom suit for this customer that was ordered with PLENTY of time for him to receive it before a wedding, but it arrived nearly three weeks late. When it arrived, the pants were 8 inches short. Although most Consultants tend to leave the bottoms of their customs "unfinished," I have gotten into the habit of finishing the bottoms at the factory, to free up minutes in our Tailor's shop. I am most pleased with my custom work when the customer can take the finished product without it ever having to grace our Tailor's shop, and I have achieved this result frequently enough to feel comfortable with continuing the practice. Unfortunately, when the customer came in to pick up his suit, I was not working, and the pants were 8 INCHES TOO SHORT! I know that the pants were 8 inches too short, because when I came in to open the next morning, the suit was literally SPLAYED OUT on the counter with a note written in bright red marker "8 INCHES TOO SHORT???" Of course, I was aghast, and immediately wanted to figure out first how to correct the error (because time is of the essence of this client), and second to understand how the error had occurred. It was too early to reach custom support, so I immediately looked up the order details to

3

**EXHIBIT A TO NOTICE OF REMOVAL**

see what I had ordered. I had input an out seam of "41 inches," and the system calculated that to a 30 ½ inch inseam. The pants I received had a 24 inch inseam?!?!

**It is better to investigate than to assume!**

I later learned that the Store Manager had handled the pickup. When he finally reached the store, I tried to have a conversation with him about the order, but he has this way of "huffing past" certain of us, so that we must be more persistent to get him to focus on our issues. When I asked him what had happened, he suggested that I had ordered the pants 8 inches short. This was my FIRST confirmation that when he was assisting my customer, that he did NOT look up the order to understand what the error was, to understand how we might fix it, thereby exacerbating the customer service issue. The customer was given the impression that I was the cause of his pants coming in 8 inches short. I opine that It would be impossible to claim that we delivered competent customer service to a customer who received a custom suit three weeks late, with pants that were 8 inches short, and that we did not look up the order to see what the problem was. It appears as though the Manager did not investigate the matter with Custom Support, because he made the initial assumption that the "custom guy" had gotten it wrong.

This "custom guy" propaganda is so effective that the Manager has even managed to fool himself with it, on several occasions. On one such occasion, I showed up to work only to hear how on the previous day the entire store had been involved in a big and hilarious kerfuffle with a customer over how short I had gotten his custom jacket. Everyone had a big laugh at my expense at how the jacket was "so short, that we could remove the sleeves and you can use it as a vest." I had to admit that the joke was funny, and I laughed it off and hid my embarrassment long enough to investigate how the error had occurred. This customer had done a lot of business with the company, so it took me a bit of digging through his custom orders before I discovered that I had NEVER sold him any custom jackets! I had only ever sold him several pair of custom pants, and he was happy with them.

The "short jacket" that the customer was complaining about was actually sold to him by the Store Manager himself, and in my opinion, he did a damn good job on it! This complaining client is about 5'5", and was comparing a "short" jacket, which is exactly what I would have prescribed for him, to jackets in his closet that he had worn back in the 90s, when many were wearing jackets down to their KNEES!!! He explained to me how he hung his new custom jacket up in his closet next to his other suits, and that is where the confusion settled in. After clarifying to him (and not without push back) that I did NOT sell him the jacket, I was able to assuage some of his concerns simply by explaining how the fashion trend has changed. I finally had my own laugh with the client when I assured him that his coat would have been at least "two inches" shorter, had I anything to do with it.

It was not only defamatory of my character to give this customer the impression that I had "made his jacket too short," but it was also unacceptable customer service. Particularly under this "arbitrary and

4

capricious regime," the Manager must take sufficient accountability to investigate complaints, regardless of who he assumes is responsible. Had the Manager investigated THIS order, to verify that it was HIS client and not mine, then maybe he would have been honest and told this customer that at 5'5" a "short," coat looks neater on him. That would have been proper customer service, and it would have vindicated my character.

There was a previous incident several months back where the Senior Consultant was completing a custom order for a customer. She has been with the company slightly longer than I have, and is as competent as anyone with custom merchandise, but since I am "the custom guy," and since my name has to come up whenever anybody is doing a custom, they DRAG me into the situation for my "opinions." My opinions turned out to be TOTALLY OPPOSITE to what this guy wants, and there was otherwise no necessity for me to be involved in the sale; but since I am dragged over, I gave my "two cents." The guy totally rejects my suggestions ... he is looking for a long jacket and a "baggy" fit, so I try to evaporate from the scenario and go back to focusing on another customer. As the Senior Consultant continued to solicit my advice on the pant fitting, I understood that the customer was going for a fit that would never look proper with how I would have tailored the jacket ... but the order went in with the "more modern" fit that I suggested, instead of the baggier fit that the customer wanted.

Of course, when it came in, it was all Thomas's fault. I came up the stairs to hear the Manager throwing me under the bus, blaming me for another consultant's work. The customer was going on and on about what "he told Thomas," and the Manager was co-signing that it was Thomas' fault, and telling the customer that "Thomas was going to have to reorder it!" I was livid!!! Why would Thomas have to reorder it when he was not my client? I had no responsibility for the client, and I ought not to be held responsible for the finished product, every time I "help" a co-worker with a custom order, unless I am the Manager of the store. Whenever I help a fellow-consultant with a custom order, it is with the hope that THEY will remain accountable for that small portion of our collective burden, since we are all making the same money.

So, I feel humiliated again in this case with customer 7015488, that the management of the Store would fail to look up the order to determine WHY the custom pants that are already three weeks after the promise date, are also 8 inches too short! The customer's phone number and order number are on the garment when it is brought out to him. It might take two minutes to look up the order and assure the customer that "the Wardrobe Consultant who ordered this for you, (who is not here at the time) was not a moron who just ordered your pants with the wrong measurements. It also would not have taken more than two additional minutes to REORDER THE PANT, thereby giving the customer a fighting chance to get the benefit of his bargain prior to the date of his wedding event! These pants probably could have been reordered in LESS time than it takes to find a red marker, and to print out a card upon which to scrawl a big, "8 INCHES TOO SHORT," and to leave the damaged merchandise sprawled out across the counter ... apparently in an effort to shock the "moron" who made the error, when he arrived early the next morning to open the store.

EXHIBIT A TO NOTICE OF REMOVAL

Since the "mistake" was attributed to me, it was left for me to fix, which I believe is unacceptable customer service under the totality of the circumstances here. I typically fix custom errors whenever I catch them, regardless of who made the order, particularly due to my understanding of the lead time in getting custom merchandise in. These people are customers of The Men's Wearhouse. They are not my PERSONAL customers, so that nobody else can do anything for them ... especially when I am not present, and when TIME IS OF THE ESSENCE to supply the customer's needs. Since customer 7015488 had to wait for the "moron who made the mistake," to fix it, he/WE have lost one crucial day that may be critical in fulfilling this client's needs. The "promise date" for the replacement order is only a day or two AFTER the customer's event date.

I had the same feeling as I had explaining to that prior customer that I had not shortened his jacket, as I had, when I called this customer to explain that I DID in fact put his order in correctly, but that it was a FACTORY ERROR (and not my incompetence, as suggested by the Manager) that resulted in his pants being 8 inches too short; and that there is a fair chance that we will still receive the replacement pants on time. Even though this particular order was three (3) weeks late, we generally receive custom orders in about 10 days to two (2) weeks, so there is hope.

In terms of investigating the reasons for WHY a custom pant would come in 8 inches too short, there was absolutely NONE ... not even the slightest bit of curiosity or concern from Management. The only involvement that I got from the Manager, was a further quarrel, after the fact, regarding whether I should have placed the re-order with a plain bottom as I did (fixed at a 41 inch out seam, which calculated to a 30 ½ inch inseam, as in the original order); or order it with an unfinished bottom, to be fixed in the tailor shop when it arrives. When taken in context, it felt to me like I was still to BLAME in the Manager's mind, for the fact that I ordered the pants with a finished bottom. I understand the reticence of other consultants who prefer to "play it safe," and to allow our tailors to fix the bottoms in house; but I further opine that the same consultants take a similar stance where it regards the lengths of sleeves, taking in sides, tapering legs, etc., so that totally unnecessary minutes are clogging up our tailor shops!

It took the Manager long enough to take any interest in the fact that it was a factory error, and not a mistake that I had made, that I had placed the reorder before he had any chance to suggest that I should have reordered them with an unfinished bottom. After calling custom support and explaining what the error was, they had neither an explanation nor any clarification for why we got a pair of custom pants 8 inches too short, except to admit that it was an error on their part. The problem CANNOT be that I am ordering the pants with a fixed bottom, as is provided for in the application, because I have completed similar orders MANY times in the past without ANY issues. I know that our factories can fix the bottoms at the proper length, just like they can fix the sleeves at the lengths that we indicate in the application; just like they can take the waist in an inch or two; and that they can even do some of the "tricky" things that "real tailors" do, like lowering the collar, and taking in sides! I used to try on model jackets and pants on my customers when they came in to try on their customs, just to confirm that they did vary predictably

6

**EXHIBIT A TO NOTICE OF REMOVAL**

from the altered products that I receive from our factories; and thus, I have sufficient confidence that they can in fact finish a pair of pants.

When I got to work on Tuesday, while I was busy with a customer, I was notified by another consultant that there was a call on hold for me. It was the Store Manager calling me prior to his getting to the store to complain about another custom order 7041263 that I had "messed up." By this time, I am already beginning to think that "this guy is just looking for every little thing to use to harass me!" He explains that the customer came in to try his custom suit, and AGAIN the pants were short, by about "two inches," and that there is "not enough to let it out." He added (gratuitously in my opinion), that "the customer said that he told you that he wanted a medium break," to further paint the picture that I had created another error that was egregious enough to result in a reorder, and that since the wedding is next week, that we cannot reorder it. I clearly recalled that this customer did not ask me for a "medium break." Where would he have gotten that language? I spend too much time explaining pant breaks to customers to accept that I would have tapered the bottom of the pants 1" for ANYONE who had asked me for a "medium break." And frankly, with the way that I recall information, I would have distinctly remembered talking a tall slim client like that one OUT of wearing a "medium break." Also, anyone including the Manager has heard me tell every single customer that "the only reason we purchase a $400 suit today, is to flash a $14 pair of socks," which is absolutely inconsistent with a "medium break." So I outright reject the notion that this customer made any such comment ... but in any event, I was aghast, and I began to PANIC!!! This is not a conversation that I wanted to have with this customer; certainly not while I still have 7015488 hanging over my head!!!

I rushed to print out the paperwork and to conduct my investigation, which resolved that the pants I received for client 7041263 were only about 3/4" short of my expectations, so I was CONFUSED at why that should result in a reorder!?!? The Manager had suggested over the phone that I ought to reorder the pants "as long as I can get them," which was confusing to me. Then just as I was trying to get customer service on the phone, the customer walks in the door. I had already left a message on his phone. I did not recognize him at first when he walked in, but he began to explain that he had come in to try on a custom suit last night, and that he might have left a shirt that he meant to take with him. I had ordered him a custom shirt as well as the suit. He was going on and on about how perfectly the shirt fit, when I cut him off to apologize about the pants. He responded "yeah, they were short." How short, I asked him, to which he responded, "about two inches." So, I responded, well that doesn't sound like it is too short for me to fix, do you mind if I see you in them; to which he responded "sure." To make a very long story a little bit shorter, customer 7041263 walked out of the store 10 minutes later with his custom shirt and his perfectly fitting custom suit, that only spent about 5 minutes in our tailor shop.

It was at least unacceptable customer service (and probably cruel) to leave 7041263 with the impression that he might not have his custom suit for his wedding, just to "stick it to" or embarrass me for "personal reasons." The store wasted this man's time with this kind of service. He came in to pick up a custom shirt and a suit with pants that were only a little short in the length; so why was he not out of our store in 10 minutes, and back at his desk leaving us an excellent review? Although customer 7041263 was not happy

7

**EXHIBIT A TO NOTICE OF REMOVAL**

with the prospect of not having his custom suit to use for his wedding, he DID intend upon wearing the beautiful custom shirt! In fact, he thought that he had taken it with him! He made several stops after leaving the store, so he had to backtrack through SEVERAL stores to find out where he had left it! You probably have no idea of the level of stress that a person can endure while trying to work through all of the planning and machinations of a wedding!!! It took him until the next morning to wind back up in our store looking for his shirt, because he was so sure he had taken it with him. Maybe we cannot be held to blame for the customer leaving his shirt in our store? But consider what if we had delivered the excellent customer service that we portend? If upon the pick-up, the Manager had simply taken the suit downstairs to fix the bottoms, placed everything back into the bag, and sent the customer on his merry way, how much time and agita could we have saved this customer, who is already stressed out preparing for a wedding? Luckily in the end, he found his shirt and didn't have to look for another suit!

It is better to be the hammer than to be the nail!

While I am discussing incidents of harassment and embarrassment in the workplace, I have to mention a typical incident which occurred a few months earlier that I had hoped would not have to address, but that it succinctly exemplifies my perspective regarding my relationship with the management of this store. I admit that prior to Men's Wearhouse, I have ZERO background in retail or fashion, despite my personal fashion acumen. I tend to be "trendy," with my own "style," but, prior to my employment here, I had found no concern for what anybody else was wearing. Since coming to work here, I generally opine that the shorter jackets look better on most men. I personally transitioned from a "42R" to a "40S," and I have consistently advised customers of the trend of wearing the jackets "shorter," so that it may not completely cover the behind ... specifically, that the jacket should not "hang or dangle" from your shoulders down to below your behind. Instead, in my opinion, the jacket ought to be tailored to the customers figure (center seam in) and that the back of the jacket should neatly rest on his frame.

I have used the design of the more modern "slim" (Kenneth Cole red label) and "extreme slim" (Egara) jackets, to illustrate and explain to customers how these designers are not making the lengths of the coats any more than ONE inch longer than the sleeves. So ... it follows that for 99.99% of my customers, that if they shorten the sleeves by one or two inches ($20), that they ought to also consider shortening the coat to at least that same extent ($50). Many who follow this trend prefer a coat length that is no more than a half inch longer than the sleeves. By contrast I understand that the store Manager personally prefers a longer jacket and believes that the jacket ought to "cover your behind," so that he would not have any issue with a coat that is three to four inches longer than the sleeves.

MOST customers enter the store and ask for a "slim fit" suit. A simple google search will clarify that the "hallmarks" of this look are a shorter jacket, a narrower lapel, and a tapered leg ... so when a customer asks ME for a "slim fit," I clarify within the first 15 seconds that they are about to pay about $200 for their alterations, UNLESS we have the several weeks necessary to go custom. Therefore, I am usually selling a custom suit, or a suit off the rack with a shortened coat at an average of $200 in alterations, AGAINST

8

PUSH BACK from the management in the store!!! It has become a source of anxiety for me, that a customer who has decided to go for a shortened coat may pick up when I am not in the store, and that whoever picked up the suit in my absence would influence that customer that the jacket which came in exactly the way he had specified was "too short," according to that consultant's opinion. Luckily this has only happened once that I can confirm.

**Size doesn't matter.**

I had a new customer in the five-way-mirror. I typically mark my own alterations, and I have generally been given "kudos" from the tailors for my pinning and markings. This is one of my contributions to saving minutes in the Tailor's shop. In fact, there are many times when the tailors refuse to come upstairs for markings when I am in the store, because they accept that my markings are generally as good as theirs. One caveat is that the tailors will NEVER suggest to a customer that the jacket should be shortened. I have gotten used to being the "odd man out," on the issue of the shorter jackets, when the Manager of the store "prefers" the longer jacket style. It is to the point at where I feel "shunned away" from other consultant's sales, when the customer is below 5'8". I get the clear message that these other consultants KNOW that I want to suggest to their short clients that they ought to shorten their coats, but that my cohorts are taking personal "victories" (at the customer's expense), in sending short customers out of the store in jackets that I opine are too long on them.

I have become a bit infamous in the store for withholding my "opinions," because it is not always fun being the "odd man out," especially when I truly believe in my position. I try to stay out of it when customers ask me "what do you think," but several times I have admitted that I thought that a jacket was too long, which resulted in the customer paying to have it shortened. I even recall an instance when the Senior Consultant asked me to mark alterations for a customer, but to "please not mention shortening the jacket," but when I saw the customer it is was impossible for me not mention it. I actually TRIED to avoid it, but he asked me "what do you think," so I responded "what do you mean what do I think," the question is how do you want to look, you can wear your clothes however you want ... and this went on for a minute until I "gave up" and told the customer, against the consultant's wishes, that I though the coat was too long already, and that once we shortened the sleeves two inches, that the coat would look even longer to me. I gratuitously added that "I would never wear a coat that long." And this customer was quite happy with the suggestion to shorten his coat, after he saw what it looked pinned up, and he continued thanking me again when he came back to pick up.

So ... when I had this customer, who I had already interviewed and subjected to my regular spiel, in the five-way-mirror pinning his coat to be shortened, I was not totally surprised to hear the Manager, who had neither spoken to this customer nor talked to me about him, interrupting my transaction to challenge me "are you shortening that coat" with a clear semblance of authority! I was taken aback by the intrusion, and before I could think of a response that would not further confuse or embarrass myself or the customer, the Manager asked the customer directly in the same authoritative tone "how tall are you sir,"

to which the customer responded "6'2" ... after which the Manager scoffed at me "you don't need to shorten that coat!" Before walking off in a huff.

I took a second or two to gather my composure, and I reminded the customer ... as I had only minutes earlier admonished him ... that it was HIS choice in how he wanted to wear his clothes. I explained that (despite the suggestion from Management) I would continue to pin the jacket for shortening so that he could have a visual of how it will look when finished. I had not finished pinning it before the client was verifying that he ABSOLUTELY wanted the jacket shortened, which is what I would expect after my initial interview of that customer. I was able to quickly explain away the Manager's obvious attempt at sabotage, by explaining the constant struggle I have faced in these stores while trying to meet the customer's demands, when they conflict with "styles" that "older" managers and tailors have traditionally preferred.

This customer was not in any "time crunch," where he needed any "quick turnaround." He had already developed a confidence in the consultancy that he was receiving, and he was ready and willing to buy whatever I was selling him. He had the two weeks that we require to guarantee turnaround, and he was receiving excellent customer service. There was no just cause for Manager's intrusion, other than blatant "harassment," and an attempt to embarrass me in front of a customer. I have never (before now), demanded any answer for why he took such an interest in the length of this customer's coat. I suspect that he was "upset" about something totally unrelated ... [for example, this attempt to embarrass me may have been in response to my "push back" at being expected to carry deposits to the bank, which is a detail that I was not very comfortable with (for my own reasons) before seeking further counsel upon the matter.] Whatever his reasons, they made no business sense to me, and it was at least ridiculous if not "unacceptable" from the perspective of customer service.

If a survey were to be done of all my custom and off the rack sales throughout the years, it would be confirmed that at least 85% of my suits have had the coats shortened. I have sold as much of the custom merchandise as I do, because I consistently explain the value of saving that $50 to shorten the coat, among other alterations. The rest of my customers simply do not have the time for custom, but are HAPPY to spend the extra money to shorten the coat ... so WHY does this store, or the company in general behave as if it does not want this tailoring income? I feel as if we are almost threatening customers that if they don't have time for a two-week turnaround, we can't sell them a suit at all which allows them to "like the way they look!"

I have gotten used to selling "ill fitting" suits to customers on a short turnaround, with the promise that they will return later to have the tailoring done that will make the suit look like the $400 that they paid for it ... and several have come back. I just recently had an old customer return to the store to have several old suits with the longer jackets shortened. I had forgotten about helping him more than a year ago, when I had gotten him excited about wearing his jackets shorter. I explained to him at that time that he could bring in his older suits to have the coats shortened to update them, and he just returned last week. I recalled that I had spent a LONG time with him previously, and that he was the same "type" of customer

**EXHIBIT A TO NOTICE OF REMOVAL**

that Senior Consultant was trying to dump on me, which has inspired this LONG missive ... The pants of three of these old suits had pleats, so we also suggested that he have those removed. He was glad to spend over $1,200 re-tailoring old suits based upon my consistent shortened jackets spiel from a year prior.

I am looking at this from the perspective of revenue, and becoming confused at WHY a company that was delisted after a bankruptcy cannot see the benefit in increasing the tailoring revenue? What do we have against increasing tailoring?  I am willing to bet that we could raise far more via increased tailoring revenue, than we have EVER raised by giving away free "courtesy measurements" to Generation Tux and the rest of our competitors.

The only reason why I cannot sell $200 in alterations with every suit, is because the tailor shop cannot handle it.  We have tailors who finish an entire DAY'S worth of minutes, by 3:00 PM, and spend the rest of the day watching soccer!  The rest of the management team has acquiesced in the tailor's delusion that "THOMAS" has some sort of vendetta against the tailor shop, or that maybe I have some vested interest in making them work harder than they want to.  I have a "bad reputation" as "the one" who makes the tailor's lives miserable, when in fact, our lead tailor watches as much soccer upstairs as he tailors clothes downstairs ... and I can vouch that he is an otherwise phenomenal tailor!  I recall a situation when he shortened a coat for a customer (120 minutes) in 30 minutes while the customer waited for it. I don't recall whether I was more impressed with the speed and perfection with which he performed the work; or if I was more amused at what advantage a fast tailor could take of this system ... but there are definitely customer service drawbacks to using "Thomas" as the "Tailor shop scapegoat."  For example, our super-fast tailor has recently "slow walked" work for a customer who was waiting for it because he believed that I had placed "a special" on his rack.

This poor customer was a very large person, and was clearly self-conscious about his weight, and appeared nervous about the level of customer service that he would get.  I sensed his disappointment when he could not rent the pants that he needed, so I stepped in to assist him with pants on the retail side and got them tailored, but he still had to rent a jacket and bib (XXXX) vest.  I didn't realize how sincerely he regarded our assistance until he kept going on and on about how he appreciated our help.  When this customer came in to pick up his order, the jacket had come in with the sleeves too long, so they had to be tailored.  I already knew by that time, since the entire management team's acquiescence in the rouse that "THOMAS" is the problem in the tailor shop, that I should have the Manager's "favorite" to put the jacket on the Tailor's rack, but alas she put it there while he was in the bathroom. When he returned to find it, he knew that THOMAS was responsible for "overworking" him that day.  The customer sat in the fitting room waiting for the coat for over an hour.  I was embarrassed to keep walking past him as I helped other customers, but he was humble and did not complain.  That rental jacket was the only work performed by that Tailor in that hour, and I have seen them fix sleeves in what seemed like 10 minutes.  I am "persona non-grata" in the Tailor shop, barely able to enter without being cursed out in Albanian. Had the Manager (who was not present) put that coat downstairs, the customer would have been out of the store in 15 minutes.

11

It is better to say "I do," than to invite mental health issues ...

So ... this brings me to the crux of my admittedly long-winded complaint, which is that I am now being compelled against my will to become a "Wedding Consultant." I am sure that everybody who knows me also knows that I am NOT a wedding consultant, and that I have never had any intention to be a wedding consultant. I have neither the penchant nor the personality to be a wedding consultant. It is not possible that I could ever be "happy" or "comfortable" in that role. Of course, I CAN do it, and finally after this long course of harassment, I am going to acquiesce in doing it ... and like everything else that I do ... I am going to be PHENOMENAL at it; as I attempt to be at everything else that I do, I have already been as busy in the tuxedo department as anybody else in the store, but apparently this is my "punishment" for standing up to the Senior Consultant, and otherwise demanding upon a true return to the "up system."

After venting my frustrations about having too much of the workload, the Assistant Manager agreed with me that we ought to go back to the "up system," so that all of the Consultants will take turns, instead of "the same old suspects" taking every customer who comes through the doors, while the rest play "not me," or cannot help the customers that they do greet. The Assistant Manager appears to have taken the situation seriously enough, that she published the "up list," and even laminated copies for the Wardrobe Consultants to take ... I believe that "an attempt" was made at instituting the system after I left early at 12:00 PM on Saturday the 28th to celebrate my 13th wedding anniversary with my wife, but it does not appear to me that the Manager or the consultants in general took the system seriously.

By the time they came to work on Sunday, the reinstitution of the "up system" had already "bit the dust"; or so they thought! As my coworkers began to arrive, I mentioned to each of them that we were "back to the up system," and the general response was to LAUGH IT OFF as something that had been "tried and denied." The universal sentiment was that the "up system" was something that was too confusing for any reasonable person to understand. They could not grasp important principles to the system as simple as:

(1) It is your JOB to know when it is your up.

(2) "When it is your up, you should be standing AT THE DOOR, so that you are the first person to greet the customer." Or that

(3) Once a person has taken an up, that every other Wardrobe Consultant must take a customer before that same Consultant ought to take another customer

My fellow Wardrobe Consultants have collectively agreed that "they do not know who is up." So I would postulate the maxim in this post-commissions era that:

**EXHIBIT A TO NOTICE OF REMOVAL**

When you do not have a customer, and you do not know who is up, then IT IS YOUR UP!!! So you should be standing at the door!  Whenever we do not know who is next at the door, we have a customer service issue!  To not know who is "at the door," is to not have any plan to satisfy the next customer who walks through the door.

I cannot help but to opine that "management" in this instance is complicated by the Manager's penchant for hiring young ladies who he treats as "daughters" rather than as EQUAL employees. There is more than a fair amount of deference and cute little "pet names" (baby, sweetheart, darling); and hugs and the like, while generally being distant and "attitudinal" with the management staff.  For months, the Assistant Manager complained to me about getting the "cold shoulder" from the Manager, and not understanding why. For example, it sends the wrong message when the manager enters the building and exchanges a bunch of hugs for the "babies" and the "sweethearts," but then a cold and distant "what up dude" to his management staff.  It undermines our authority to impose such measures as fundamental as the "up system," particularly when the manager does not enforce it himself.

In fact, my suspicion is that the ONLY reason that the Manager has acquiesced in enforcing the "up system," is to force me into the role of a "Wedding Consultant," in order to PUNISH me for not taking the customer from the Senior Consultant. Otherwise, he does not enforce it, and no other Consultant will be responsible for it. Consider for example that although it has NEVER been the policy of this store that a Wedding Consultation was an "up," for the rotation at the door, the Manager has made it clear that enforcing the up system means that I will have to take on the role of a Wedding Consultant if such a situation walks through the door while I am up. I accept this challenge only with the reticence that wedding consultations had never been considered an up prior to my rejecting another Consultant's customer.

Since I am due "Equal Treatment" under in employment, I am sure that this means that every other person who is employed as a Wardrobe Consultant will receive the same treatment.  This includes that it is a Wardrobe Consultants duty to know when it is their up, and the management's duty to consistently enforce the system. And that as fervently as the Manager works to ensure that I am taking wedding consultations on my ups, he must also ensure that I am not taking another up before every other Consultant has taken their turn at the door. The Manager must treat all employees equally … for a final example, he cannot allow one consultant to skip ups and talk on the phone all day in the store in front of customers, while forcing me to do everything from policing up every custom in the store to now becoming a Wedding Consultant. I am willing to help any of my coworkers to do anything, but I will not endure harassment or unfairness of any kind.

One suggestion I would make, is that in this pos-commissions era, that the up system ought to be "inverted" or reversed, so that the least experience consultants go first, giving those employees more

opportunity to train with helping different customer needs. If the least experienced goes first, then there ought to always be someone more experienced available if they need assistance. When the Manager goes last, then he is obviously freer to manage the entire process, most importantly the "up system" itself. So long as we have employees playing "not it," the Manager ought to be near the door, making sure that one of them is "at the door," at all times greeting the customer, and so on.

Men's Wearhouse needs to understand and take stock of the decision that they made when they decided to switch from commissions to hourly pay, considering the context of the changed work ethic that we are facing. When the company abandoned its commissions structure for hourly pay, it changed something fundamental about the way Wardrobe Consultants view customer service. George Zimmer alluded in his book to his initial reticence to instituting a commissions structure, that was assuaged by his later understanding that the average person is not going to help the customer, just because it is the "right thing to do." If a "salesperson" is motivated by commissions, and we intend to transition to some other motivation, there needs to be a real "campaign" to roll it out, and it needs to be MANAGED ... the "up system" is the place to start.

Sincerely

Thomas C Brooks, Jr

Wedding Consultant

6/1/2022

Exhibit D

**EXHIBIT A TO NOTICE OF REMOVAL**

## The "Up System," is not as Complicated as Cryptocurrencies.

I clocked in a few ticks after 11:00 AM today to begin my first shift as a Wedding Consultant. No one was "at the door." As I suspected, since the "up system" is not being effectuated, there were several Consultants "milling around," while customers helped themselves. I approached a young man near the shirt wall who just happened to be PLANNING FOR A WEDDING. I congratulated the young man and informed him upon how LUCKY he was to be my first official "wedding consultation."

Unfortunately, I did not get the pleasure of selling to the groom. He had already purchased the green Ralph Lauren separate from online that is not available in stores. He explained how he didn't really want to "beat his groomsmen up in the pockets." He wanted them to be able to spend "as least as possible," but he wanted them to wear a "grey linen suit." He stated how he was not so particular about the shade of grey for his groomsmen's suits. For example, if any of them already had a grey linen suit, he would be just fine with them wearing whatever they had. He and his fiancé are both employed in "artistic" fields, so that he is not used to wearing suits, and they are not so particular about "formality," or even necessarily uniformity. He gave the impression that he would be just fine with each of his groomsmen going into whatever store they chose to purchase a "grey linen suit." We spent at least 30 minutes discussing my opinion regarding the choice of wearing "different shades of gray" in a wedding scenario or should everyone be forced to wear the same color of gray.

Unfortunately, since I HATE weddings, and have only ever been to two that I can remember, I have very little of ANYTHING to draw upon in answering this question. I did recall a wedding that I had fitted a gentleman for several years ago, where the groom had told all his groomsmen to "just wear a navy-blue suit," understanding that there would be various shades. I recalled how novel an idea I had thought it was at the time, so I drew upon that experience to expound upon my general maxim as it regards fashion, that "you can do whatever you want to do." I had only taken measurements, and a down-payment for the fellow who purchased that navy-blue suit. I never even was the pictures. But I admonished my first groom that so long as they will be happy looking at those photos 40 years from now, then THAT is all that is important! We were going back and forth over his reticence to "different shades of grey," and all of the implications, until I finally decided to TRY to "cut it to the quick," by asking him if any of his groomsmen already had a grey linen suit, to which he replied that they did not. I then ascertained that the prospect of any of his groomsmen shopping anywhere other than Men's Wearhouse was slim to none ... So I interjected that there was only ONE shade of grey linen that we can practically be dealing with, because Men's Wearhouse only has ONE!!!

The whole conversation was only "academic," because although his wedding plans are real, he was only actually stopping in to purchase a dress shirt. But I was able to clarify for him that since his groomsmen will be wearing the grey linen, that he has the choice of doing to either custom, or "off the rack," so long as the inventory is available. Today, when he was in the store, we did not have even one linen jacket to show the customer. Luckily, we had a few of the pants so that he was able to see the color. I was not able

Your Reluctant Wardrobe Consultant 6/2/2022

EXHIBIT A TO NOTICE OF REMOVAL

to book the wedding, because he had to get back to work. He had already been in the store, at least 10 minutes prior to my clocking in. I spent close to an hour with him going over all his options. Imagine what if we had a competent consultant "up at the door," when this wedding customer came in!

**Don't be a "skip-up."** ☹

After my first official wedding consultation, I took an up from the door. This customer was OBVIOUSLY "just looking." He made it clear that he didn't need help, but he was taking a close enough look at a variety of things, enough to cause me to stay close enough to answer any questions. There had to be at least ten (10) consultants in the store at the time. This customer has made it clear enough to me that he does not need my help, and I am beginning to feel like I am "bothering" him by hovering, so I move close enough to another two (2) Wardrobe Consultants who were involved in a conversation in the middle of the store. There were another four (4) consultants caviling about behind the front counter. I was keeping my eye on my customer, as he slowly making his way toward the front of the store, still examining the merchandise. It was clear that he was going to leave without making a purchase, but I feel obligated to keep my eyes on him until he has left the store. Before my customer has left, another gentleman comes walking quite deliberately towards myself and my two colleagues.

"I need help with a tuxedo; can you help me with a tuxedo." I initially hesitated to answer, since I already had a customer in the store, but as soon as I recognized that my fellow consultants were going to play the game of "the first one to speak is the loser," I asked the customer ... "are you looking to rent, or purchase," to which he responded that he wanted to purchase. He was a middle-aged gentleman with a big belly, and he seemed like the kind who "needed help," so I was happy to help him, especially since I could see my customer heading towards the door out of my peripheral vision ... and also ... to be quite honest ... with the stress of the "arbitrary and capricious" machinations taking their toll on my mental health ... I would actually PREFERED to take this customer, because it means that I get to go downstairs, out of sight of the "skip-ups" for a while!!!

On the one-hand, I felt that it would be a "quick up," because we really have ZERO retail inventory in the store; but then on the other hand, if this customer REALLY needed a tuxedo, then it might take me some calling around to other stores and a lot of leg work. The last few that I have sold have required a lot of ordering for pieces that we did not have in stock. As luck would have it, we had a "nested" Pronto tuxedo 52R, that actually FIT this customer with minimal alterations!!! As I was putting him in the 5-way-mirror to look at the fit, he mentioned that he needed this tuxedo for Masonic Lodge meetings. This lightened my heart a little, since I am also a Freemason, and I have enjoyed providing customer service to fellow Masons, and even several who have pretended to be Masons! But this gentleman was my actual Lodge Brother! We had not recognized each other because we were both wearing masks, and I have not been to Lodge in over two years.

2

Your Reluctant Wardrobe Consultant 6/2/2022

**EXHIBIT A TO NOTICE OF REMOVAL**

The first person to speak is the loser.

I am willing to bet that 95% of all Masons who belong to the Grand Lodge of New York, and a similar percentage who belonging to the Grand Lodges of every Country and who TRAVEL to New York, own a tuxedo, and typically wear tuxedo shirts. These are millions of people who may wear a tuxedo once a month, which may be more frequently than most men wear suits today. While Men's Wearhouse was falling for the "COVID 19 rouse" that "suit wearin is gone forever," customers from this realm are still wearing suits! Since this was my Lodge Brother, I was able to share with him my frustration with how LAZY my cohorts have become since we are no longer paid by commissions! I lamented how there is absolutely "no way" that I should have you as customer, since I already had a customer when you walked in." I explained that, since I was already WITH a customer, that someone else had to be "at the door," and that THEY should have helped him.

My client explained to me how he came into the store and stood next to the counter. He states that there were several Consultants standing there, but that they were involved in a "serious conversation." He began to give me some of the details of the conversation ... enough to cause me to STOP him ... because I was absolutely AGHAST that he was able to grasp that level of the depth of the conversation before any one of the four (4) consultants behind the counter acknowledged him and greeted him. He stated that he waited long enough for a "natural pause" in the conversation to interject, but that he got frustrated waiting, and so walked over to ask the next group of employees he saw engaged in a conversation for some help. So, in the end, I am glad that I was "it" in this situation, because I would hate to see any of my brothers receive bad customer service in our stores.

While I had the customer in the fitting room downstairs, I skipped back upstairs to chastise my fellow Wardrobe Consultants for skipping their ups! From now on, I am going to refer to Wardrobe Consultants who allow other consultants to take their ups, as "skip-ups." A "skip-up" is a GRIFTER upon the common-commission pool! When we made individual commissions, there was no such thing as a consultant who did not understand the up system. Certainly, there were those who gained reputations for "stealing ups," but there was no one who did not understand when it was their turn to take the door. Today, post-commissions, when you mention the "up system," the retort is that "anybody can help," or they shout back in unison "we are all up." But whenever any customer enters the door, the "skip-ups" scatter and begin to play "not it." So long as you are not the "custom guy"; cannot do returns; cannot sell a suit, or "don't know the answer"; you are "not it," and as a collective group nobody has any idea who is "at the door."

When I complained to my co-workers that I shouldn't be with this next customer, since my customer had just left the building, the retort was "anybody can help." I pointed out the fact that this customer had walked past four people at the counter, and that there were three of us sitting together when this customer approached. The looks upon their faces taught me what it means in retail when they say "the first person to speak is the loser," most poignantly in this post-commissions erra.

3

Your Reluctant Wardrobe Consultant 6/2/2022

EXHIBIT A TO NOTICE OF REMOVAL

**Men's Wearhouse Stragglers**

When I came back from eating my lunch, I noticed that nearly the entire store was congregated near the front. There had to be at least (10) consultants in the store; several of them involved in a deep conversation about cryptocurrencies and block chain technology. At this point, I am beyond assuming that any of my post-commission colleagues would have claimed this customer as an "up." So, I approach to ask, "are you being helped," and of course he is not. He is looking for accessories to wear with a navy-blue suit, and he shows me a photo on his phone of an "orangish" thing that suggested one tie that we have, and a pocket square with commensurate affectations. I reflexively transition into my lesson upon how the SOCK is the focus of the outfit, and so that now we MUST find a sock that will be the "wow factor" for the whole shebang! My heart was set upon finding a pair of these neat "chicken and waffle" socks that I have paired with the same tie before. That combination sat on a mannequin throughout the pandemic, but alas that sock was gone. We found a sock that was just as nice ... it was a "bacon and egg sock," with yellow and orange effects. I was even able to sell this straggling customer a pair shoes while the skip-ups caviled about at the font of the store.

And ... while I assisted that customer, ANOTHER "Men's Wearhouse straggler," approached me trying to figure out a shirt size to purchase a shirt. He was an odd fit. I measured his neck at about 15 ½ and his sleeves at about 35 ¾ , so I needed to try something on him. I went downstairs to get two try on shirts; one was 15 ½ 34/35 and the other was 16 36/37. After trying the two sizes, we surmised that he preferred the larger shirt with the longer sleeve, so now the search is on for a white shirt in the proper size. I searched every single white shirt on the shirt wall, and did not find one single white shirt in the size we needed; so I resigned that I would have to order the shirt ... but JUST TO BE SURE ... as if it was not SWELTERING HOT in the store, and as if I was not already SWEATING BULLETS ... I skipped back down the stairs one more time to make sure that we did not have a white 16 36/37, hiding amongst the "try on" shirts, and BINGO!!! We had it!!! I celebrated this little victory even as I lamented the grifting of the skip-ups who should have been helping this customer. As my luck would have it, I finished with both stragglers at the same time. I generally prefer to ring up my own customers, but since I didn't want either of these gentlemen to suffer any further poor customer service, I preferred not to have either wait, and so allowed a colleague to ring one of them up for me ... bad idea!

I have a routine for pitching my perfect-fit and custom sales propaganda as a bundle. Anyone who has stood anywhere near me while ringing up a customer has heard me say verbatim:

> "The $50 coupon that Men's Wearhouse gives you is the ONLY thing that we give you, that you can use for custom merchandise. Everything else that we give you will exclude customs and shoes, etc, but these $50 coupons are good for customs. We have customs that begin at $399, and this includes the tailoring for as long as

4

Your Reluctant Wardrobe Consultant 6/2/2022

**EXHIBIT A TO NOTICE OF REMOVAL**

*you own them.  This always beats the price of altering a suit off the rack, which may cost you the same thing plus up to $200 in alterations … so I always encourage customers to save them for customs. So whenever you need a really good fit, come in here with about 4-5 weeks so that we can go through the whole process …"*

I have not rung up any customer in at least the last three (3) years who did not hear exactly that at the register.

So I was aghast to hear my colleagues' lazy "do you want to join perfect fit," after I have just sold this straggler a FANTASTIC tie, pocket square, sock, combination along with a pair of shoes!  We have customers that we are not able to enroll into the program, but this was not one of them. This one was lost in the customer service approach.  Had I any reason to suspect any reticence, I would have allowed my colleague to ring up the other straggler. Although we made both sales, had we treated these stragglers like customers, I am sure that we would have gotten them both into the Perfect Fit program as well.

5

EXHIBIT A TO NOTICE OF REMOVAL

Exhibit E

 Gmail

Thomas Brooks <brookstcjr@gmail.com>

---

## DOR: Business Operations

3 messages

---

**Thomas Brooks** <brookstcjr@gmail.com>
To: tcb30@tmw.com, jam39@tmw.com, rqs1@tmw.com, hfe2@tmw.com
Cc: jcv3@tmw.com
Bcc: gak1@tmw.com

Tue, Jul 5, 2022 at 9:31 PM

Greetings Team!!!

I first want to express my excitement at this new Division of Responsibilities system that we are working out. I wish we had done this two years ago when we first came back after the shut down ... but alas here we are, and I want us to make the best of it! I have some initial reticence/confusion due to what feels like a lot of "overlap" between our several responsibilities, but I think we can work through that as we work together putting more specifics ("meat on the bones") to the framework that has been rolled out.

I have been given the focus of "Business Operations," which I understand to give me some prerogative to affect the "business" to some extent? So I want to share some initial directions that I would like to follow:

**Custom Sales:** My "business instinct," given our focus upon customer service, is to LEAD WITH CUSTOM! Naturally, we are not going to be able to sell custom to EVERY customer, but that we maximize our chances when we present the opportunity to every customer. It is my opinion that we naturally give the best customer service to those customers who purchase custom merchandise. This is partly because the process of selling the custom merchandise gives us more of an opportunity to demonstrate our expertise in general, AND because the Joe Custom remains the best price point for the customer who is looking for a "slim fit," in a wool suit.

I have already recommended that we coach the sales staff to familiarize themselves with the "promise dates," for both Joe and Joseph Abboud lines, and to lead with the interview question, "*when do you need it,*" so that we are FIRST suggesting custom, and then only falling back on the in-store options when we do not have time for custom. I see several benefits to this strategy including the following:

- Increasing the opportunities to train the younger staff on the custom process, which makes them better at fitting/selling suits (and rentals) in general.
- Increasing our customer service score in general by offering the "custom experience"; more variety; a better fit ("love the way you look," etc.)
- Freeing up time in the tailor shop, by producing customs products that we do not need to alter in-house.
- Another angle for getting customers into the Perfect Fit program, since the $50 certificate is the ONLY thing that Men's Wearhouse regularly gives to customers that they can use for the custom merchandise. (I encourage every customer that I deal with to enrol for this purpose.)
- Marketing/promotion of the custom product in general, since REGARDLESS of all of the commercials that Men's Wearhouse runs, 99.99% of our customers **do not know** that we offer custom merchandise until we tell them in the store!

In my conversations with James regarding "leading with custom," he pushed back that "it is not the Men's Wearhouse way to offer custom first." He suggested that we ought to first sell what is in the store, and that custom ought to be something like a "fall back position." I want us to discuss this at our first opportunity, because I feel totally at odds with it. I can't understand why as a customer that I would want to purchase "off the rack," when I can "go custom." Why would I not want to pick between shoulder/chest fits; choose my own lining; dicker all of the details; and have my name embossed in the garment, when I can usually get that for LESS money than altering something off the rack? Most of our customers will not have the time, so WHY can't we, or why shouldn't we offer it to every customer that does? I want to understand this.

**Up System:** I continue to advocate for some version of the "up system." In my opinion, 5470 will reach 100% customer service satisfaction when we have sufficient / competent staff to have achieve a ratio of one consultant per customer (1/1); meaning that our consultants will generally be competent to satisfy the needs of a customer and get back into rotation before anyone has to "double up." This simply means that we always have someone "at the door," to greet a customer, and that this person remains responsible (with "eyes on") for that customer until they leave the store. I would suggest the following protocols for the "up system."

- That whoever is "up" should stand "at the door." (Their feet should be physically somewhere upon the brown tiles at the front of the store, so that there is no question as to who will be greeting the next customer through the door.)
- That once the customer has been greeted, the consultant puts their phone away, and does not pick it up again until their customer has left the store.
- That the consultant must remain within a reasonable distance, even if the customer "does not need help," to answer any questions and prevent potential shrinkage.
- That if the customer is "shopping," that the consultant must lead with "when do you need it," and first suggest custom, etc.

Thus far, I have been able to train the following consultants on customs:

- Jordan (several times)
- Jesus Tejada (2x)
- Jesus (1)
- Aria (3x)
- Cheyenne (1x)
- Renee (1x)
- *Veronica (1?) [I believe James went through one with Veronica]

Every one of them had sufficient aptitude as far as measuring and fitting was concerned, and they were all predictably intuitive with the application on the Ipad ... They just need more opportunities, which they will only get if we can get on the same page by pushing CUSTOM FIRST, and then selling what we have in the store when there is no time for custom.

I understand that I may not get ALL of what I am asking for, but so long as we are going through this process (DOR) I want to fully participate and suggest what I believe will make us successful. I also want to understand the rationale behind the push-back against selling custom, so that we are all on the same page. If it is just a "matter of choice," then I would push to follow my suggestions for the six months that I am in charge of this area.

I eagerly await our discussion on the issues I have raised.

Thomas C. Brooks, Jr.
DOR: Business Operations
Men's Wearhouse (5470)

---

**Thomas Brooks** <brookstcjr@gmail.com>
To: hanyelgazzar@yahoo.com

Tue, Jul 5, 2022 at 9:32 PM

[Quoted text hidden]

---

**Verga, James C (JCV3)** <James.Verga@tailoredbrands.com>
To: Thomas Brooks <brookstcjr@gmail.com>, "Brooks, Thomas C (TCB30)" <Thomas.Brooks@menswearhouse.com>,
"Mosley, James A (JAM39)" <James.Mosley@menswearhouse.com>, "Rossi, Rhea S (RQS1)"
<Rhea.Rossi@menswearhouse.com>, "Elgazzar, Hany F (HFE2)" <Hany.Elgazzar@menswearhouse.com>

Wed, Jul 6, 2022 at 6:43 AM

Thomas,

I agree custom is a large opportunity, and one we should continue to explore, but at this time mandating we start there with every customer is not something I recommend. I believe we talk to our customers and allow their needs to dictate the path we take them through. We should certainly educate all of our customers at some point in the consultation about custom, as it is one of their options, potentially in the future if there current timeframe does not allow for it.

For the up system, I agree there needs to be consistently, but achieving 1/1 service at all times will be difficult during rush periods. We need a system that will allow us to direct customers and still give them excellent service, understanding this will happen.

Have you had a chance to read through the business operations playbook? There are very specific items you will be accountable to deliver on. I want to make sure you fully understand the scope of responsibility.

Jimmy Verga
Tailored Brands

Regional Manager
Greater New York (32)
(321) 505-1565

**From:** Thomas Brooks <brookstcjr@gmail.com>
**Sent:** Tuesday, July 5, 2022 9:31:09 PM
**To:** Brooks, Thomas C (TCB30) <Thomas.Brooks@menswearhouse.com>; Mosley, James A (JAM39)
<James.Mosley@menswearhouse.com>; Rossi, Rhea S (RQS1) <Rhea.Rossi@menswearhouse.com>; Elgazzar,
Hany F (HFE2) <Hany.Elgazzar@menswearhouse.com>
**Cc:** Verga, James C (JCV3) <James.Verga@tailoredbrands.com>
**Subject:** DOR: Business Operations

[Quoted text hidden]

EXHIBIT A TO NOTICE OF REMOVAL

Exhibit F

 Gmail

**Thomas Brooks <brookstcjr@gmail.com>**

## RE: Follow up after meeting
1 message

**Kinnison, Greg A (GAK1)** <Greg.Kinnison@tailoredbrands.com>                     Wed, Jul 13, 2022 at 11:09 AM
To: "Brooks, Thomas C (TCB30)" <Thomas.Brooks@menswearhouse.com>, "Brookstcjr@gmail.com"
<Brookstcjr@gmail.com>

Thomas,

I tired reaching you on your home phone (listed in your personnel file as the preferred number 347/587-3334) but
didn't get any answer. I then left a voicemail for you o your cellphone number 347/782-2174. Please reach out to me at
your earliest convenience.

Kindest regards,

Greg Kinnison

(he/him/his)

Sr. Human Resources Partner

Tailored Brands, Inc.

ME, NH, CT, VT, MA, RD, NY, NJ, PA, DE, MD, VA, WV, DC

Office: 267.290.8305

Cell: 215.435.1957

**Email:** Greg.Kinnison@TailoredBrands.com

## BE ⅄ LEGENDARY

**From:** Kinnison, Greg A (GAK1)
**Sent:** Tuesday, July 12, 2022 6:17 PM
**To:** Brooks, Thomas C (TCB30) <Thomas.Brooks@menswearhouse.com>
**Subject:** RE: Follow up after meeting

Great. Do you want me to call you? If so, please provide your phone number.

Kindest regards,

Greg Kinnison

(he/him/his)

Case 1:23-cv-09149-AMD-RML    Document 1-2    Filed 12/13/23    Page 51 of 63 PageID
EXHIBIT A TO NOTICE OF REMOVAL
11/6/23, 4:07 PM                                                   Tailored Brands Mail - Follow up after meeting

Sr. Human Resources Partner

Tailored Brands, Inc.

ME, NH, CT, VT, MA, RD, NY, NJ, PA, DE, MD, VA, WV, DC

Office: 267.290.8305

Cell: 215.435.1957

Email: Greg.Kinnison@TailoredBrands.com

# BE ⋎ LEGENDARY

**From:** Brooks, Thomas C (TCB30) <Thomas.Brooks@menswearhouse.com>
**Sent:** Tuesday, July 12, 2022 12:21 PM
**To:** Kinnison, Greg A (GAK1) <Greg.Kinnison@tailoredbrands.com>
**Subject:** Re: Follow up after meeting

Wednesday after 11:00 AM works for me.

Thomas C. Brooks

**THE MEN'S WEARHOUSE**

(212)757-2676

135 W 50th St.

New York, NY

10020

---

**From:** Kinnison, Greg A (GAK1)
**Sent:** Friday, July 8, 2022 4:37:24 PM
**To:** Brooks, Thomas C (TCB30)
**Subject:** RE: Follow up after meeting

Thomas,

    I truly apologize missing you this week. My assistant is on vacation for the next couple of weeks, so I have been holding down the fort alone. I reached out to talk with you a few minutes ago at the store and discovered that I already missed you. Let's set a time when we can talk next week. I have availability Monday after 1 PM; Wednesday between 11 AM and 2 PM, and right now, my calendar is open on Thursday.

Kindest regards,

Greg Kinnison

(he/him/his)

Sr. Human Resources Partner

Tailored Brands, Inc.

ME, NH, CT, VT, MA, RD, NY, NJ, PA, DE, MD, VA, WV, DC

Office: 267.290.8305

Cell: 215.435.1957

Email: Greg.Kinnison@TailoredBrands.com

# BE ˇ LEGENDARY

**From:** Brooks, Thomas C (TCB30) <Thomas.Brooks@menswearhouse.com>
**Sent:** Friday, July 1, 2022 5:00 PM
**To:** Kinnison, Greg A (GAK1) <Greg.Kinnison@tailoredbrands.com>
**Subject:** Re: Follow up after meeting

Will do. Talk to you then.

Thomas C. Brooks

*Assistant Manager III*

**THE MEN'S WEARHOUSE**

(212)757-2676

135 W 50th St.

New York, NY

10020

**From:** Kinnison, Greg A (GAK1)
**Sent:** Thursday, June 30, 2022 5:03:31 PM
**To:** Brooks, Thomas C (TCB30)
**Cc:** Mosley, James A (JAM39)
**Subject:** RE: Follow up after meeting

Thomas,

Thank you for your email. I would like to set a time after the July 4th holiday to speak with you regarding this. Let's touch base next week.

Kindest regards,

**EXHIBIT A TO NOTICE OF REMOVAL**

Greg Kinnison

(he/him/his)

Sr. Human Resources Partner

Tailored Brands, Inc.

ME, NH, CT, VT, MA, RD, NY, NJ, PA, DE, MD, VA, WV, DC

Office: 267.290.8305

Cell: 215.435.1957

Email: Greg.Kinnison@TailoredBrands.com

## BE ⅄ LEGENDARY

**From:** Brooks, Thomas C (TCB30) <Thomas.Brooks@menswearhouse.com>
**Sent:** Thursday, June 30, 2022 2:52 PM
**To:** Kinnison, Greg A (GAK1) <Greg.Kinnison@tailoredbrands.com>
**Cc:** Mosley, James A (JAM39) <James.Mosley@menswearhouse.com>
**Subject:** Follow up after meeting

I met with James Mosely and Jimmy Verga regarding my frustrations in the store since we have gone to the hourly structure. I am writing to you after taking a couple of weeks to reflect. I was given the choices of being fired, quitting or "getting with the program," and have resolved that my best option today is to try to "get with the program" but I need some things clarified.

When Jimmy first called me to return to work after the pandemic shut-down, he told me that we would receive an hourly rate plus a "pooled commission." He explained that everybody coming back would be "doing the same job," whether it be tuxedos or retail, and that the commissions would take into consideration the hours worked, etc., but it was made clear that the details had not been fully fleshed out yet. Months later, after the traffic returned to the store, I sent an email seeking to remind Jimmy of that promise, and to get whatever information I could regarding the status; he responded that there is "no pooled commission at this time," still leaving open the possibility.

During my meeting with James and Jimmy, I was chided for "living in the past," and I was told for the first time that Men's Wearhouse never had ANY plans on returning to any kind of commission structure, neither pooled nor individual! It was made clear to me during that meeting that the two of them had been in meetings PRIOR to the shutdown, where it had been made clear that paying out commissions was "hurting the company." So, there was no truthful basis for mentioning anything about commissions to me after the shutdown.

**EXHIBIT A TO NOTICE OF REMOVAL**

When Jimmy called me with this promise of a "pooled commission," I was sitting at home collecting $600 week from the government. At that time I still believed in the company, and I did not believe that it could "go under." I was buying up its stock on the retail market (and urging others to do the same), knowing that it had to bounce back, because I know that Men's Wearhouse is not "just selling clothes." It provides a vital function that ordinary clothing stores have yet not matched ... so I was willing to bet on Men's Wearhouse, instead of seeking out other opportunities. I could have comfortably searched for other work while collecting $600 a week for another year. [Working at my current rate without commissions, after insurance and child support arrears are taken out, I take home about $200 after working two weeks.]

Had Jimmy told me the truth initially, that there would never be any commissions structure, I could have easily calculated that I cannot afford to work at the hourly rate he offered. The mention of a "pooled commission" even prevented me from arguing for any higher rate. I was still of the mentality of "your raise is in the rack." It would have been more advantageous for me and my family, to continue collecting unemployment, which was keeping my child support current, and the COVID 19 $600 per week "bump," which was actually putting money in my pocket. So I feel like a fool having left all of that on the table to return to a whole different "Men's Wearhouse."

It is not as easy for me to "just find another job," as Jimmy puts it. If that were the case, I might have found another job several years ago when the best thing Jimmy could tell me about my custom sales was that my "concept sucks." I was taken by surprise that he decided to bring that back up during the meeting between us and James, to deny that he had said it. I only remember it because he said it. I thought it was unprofessional then, and even more unprofessional to bring it back up years later out of context where it had no relevance, other than to harass or to escalate an already tense situation.

My initial plan was to work at Men's Wearhouse until I could get my license to practice law reinstated. I didn't expect it to take 6 years, but it has, and it may be at least a year longer before I can be reinstated ... I am somewhat at a quandary as to how to proceed. I do not want to "burn any bridges," but I am beginning to feel "pushed out." Please advise.


Thomas C. Brooks, Jr

**THE MEN'S WEARHOUSE**

(212)757-2676

135 W 50th St.

Case 1:23-cv-09149-AMD-RML    Document 1-2    Filed 12/13/23    Page 55 of 63 PageID

EXHIBIT A TO NOTICE OF REMOVAL

New York, NY

10020

EXHIBIT A TO NOTICE OF REMOVAL

Exhibit G

**EXHIBIT A TO NOTICE OF REMOVAL**

9:52              100% 🔋

<     **James Mosley** ⌄      ⋮

Good morning Thomas, this is what's to be completed today:

1) Bathroom cleaned
2) Clearance racks sized/ organized
3) Dust all surfaces

Thanks

**EXHIBIT A TO NOTICE OF REMOVAL**

Exhibit H

**EXHIBIT A TO NOTICE OF REMOVAL**

Thomas C. Brooks, Jr.
10885 Avenue M, #2
Brooklyn, NY 11236
Brookstcjr@gmail.com

October 8, 2023

Men's Wearhouse
Store 5470

RE: Resignation Under Duress / Constructive Dismissal

Good morning. I am writing to resign under duress my position at Men's Wearhouse, effective immediately. The Store Manager has created such a hostile work environment that it is impossible for me to continue in the position. I have been forced into a position that requires me to delegate work to others, after being given a specific directive that I am not to delegate work. This began over a year ago, after I had written emails to the management team regarding complaints of harassment at work by the Manager, and my disappointment with co-workers for not doing their fare share of the work. Particularly I complained that we were no longer "taking turns" at the door, and that my co-workers were not selling the custom merchandise.

I was hired at Men's Wearhouse, in or about 2016 as a "Wardrobe Consultant," to sell men's suits for a small hourly rate, plus commissions. After the COVID 19 pandemic, I was asked to return for a higher hourly rate, plus some portion or share of a "pooled commission." I was told that the hourly rate was based upon a rough average of what I had been making on commission. I was dissuaded from negotiating the hourly rate since there was also to be a pooled commission, but the pooled commission never materialized. The District Manager later admitted that there never was going to be any pooled commission.

Apparently, the Store Manager has shared the complaints of my emails with the rest of the staff, which has turned them hostile toward me. Since over a year ago whenever he enters the store, he does not greet either myself or my co-worker "Hany." He goes around to each other employee hugging and "slapping hands," until he reaches Hany and me and says "what up dude," in a way that communicates to the entire store. As a result, there are employees in the store who do not speak to me, even when we are the only two in the store. I have not otherwise had any negative interactions with any employees that would cause them to respond to me in that manner.

Recently the company has adopted a program which requires the "management staff" to rotate responsibilities every six (6) months. Since I had previously made it clear that I "hate weddings," I was given the "Business Operations" division of responsibilities, (DOR) that made me responsible for all things wedding related. Although I felt that it was done out of spite, I embraced the role and performed

1

**EXHIBIT A TO NOTICE OF REMOVAL**

exemplary work for the six (6) months that I was assigned. When I took over those responsibilities, the tasks of auditing and filing the rental paperwork had been neglected for at least two years. There were piles of documents containing customers' identity information in every drawer in the store, and whatever "files" existed were old and disorganized. I took several days and got it all organized, so that the documents could actually be found when we needed them, and I managed to keep those documents filed and up to date without help from ANYONE in the store for those six (6) months. At least twice I asked for assistance or guidance in dealing with those documents from other employees who had usually dealt with them, and there was always some pushback or excuse.

When we began the DOR assignments, the instructions made it clear that the management staff was supposed to greet customers at the door, and then delegate which staff member was to help them. I have had conversations with everyone from the District Manager to the Store Manager and the Assistant Managers who all agreed that we ought to be delegating work to the staff, but the Store Management will not support it in practice. The first time that I was "written up," over a year ago, was in response to my delegating work to a staff that simply did not want to work. It was a Sunday when only Hany and I were working with the staff, and although we had one of our most successful days in sales up to that point, the staff rejected our delegating work to them.

I followed the DOR to the letter. When customers came to the door, I greeted and interviewed them to understand what they needed. If it was something quick (a belt, a shirt, socks, etc.) then I did not bother the staff at all; I would help the customer and complete the sale. For those customers who needed more help, I would take them as far as selling them on a suit before asking a staff member to assist them at the fitting room, while I went back to the door to greet and assign the next customer. I quickly noticed that the staff would "disperse" whenever they saw me greeting a customer, so that I would not assign that customer to them ...

Apparently, the staff complained that I was delegating them work, and the store management supported them. They sat me down, and without giving me any clue as to what I had done "wrong," explained how before the staff would feel comfortable taking directions from me, that they would have to "feel as if I would save them from a burning building." The Assistant Manager, whom I had worked with before, and never pointed out any "issues" with the manner of my delegation, promised that he would "show me how it was done," but never again approached the subject.

From that day more than a year ago, I have tried to focus upon helping customers and completing my DOR Assignments, until recently when the Store Manager decided to arbitrarily add cleaning the bathrooms to my responsibilities and wrote me up for not cleaning it to his satisfaction. When I began working for Men's Wearhouse, cleaning the bathrooms was not a part of the Wardrobe Consultant's responsibilities. The DOR that I currently have is "Customer Experience," and was previously owned by Hany. When Hany was over the Customer Experience DOR, he was not responsible for cleaning the bathrooms. The Store Manager has been threatening to create a bathroom cleaning schedule for more than two (2) years but has never done so. He has one employee who does mostly cleaning, who generally cleans the bathrooms, but he sent me a text message from home, asking me to clean the bathroom, which I did sometime around 5:00 PM that Sunday, but apparently it was not to his satisfaction, and was written up for it.

I have complained multiple about the Assistant Store Manager and other employees sending customers away because they are not able to help customers with custom merchandise, and yet no one has been

**EXHIBIT A TO NOTICE OF REMOVAL**

written up for it. I have complained about store staff not helping customers, and no one has been written up for it. I my write-up, the Store Manager mentioned that staff complained about Hany and myself "vaping in the store." I deny this allegation. The Store Manager allowed vaping in the store since before COVID 19. I have never seen anyone vaping in front of any customers, but several have used vapes in the store in front of the Store Manager. Only recently did the management begin to state that we ought not to use vapes in the store, and since then no one has used them in the store; but to suggest that "staff is complaining," at this point is disingenuous.

The District Manager told me in front of the Store Manager, that "he would have fired me by now," over a year ago, in response to my complaints about the Store Manager, so it has been clear since then that I have no future in this company. The Store Manager has told me that nobody in the store likes me, and that they all only tolerate me. I find that odd, since I have not had any negative incidents with any other person in the store. I feel as if the Store Manager has been trying to fire me since then.

If the records were pulled, they would verify me as the most productive employee in the store. I used to win custom sales contests when the company was incentivizing sales. I am responsible for more retail sales and custom sales than any other employee, and I help as many if not more rental customers as anyone. Now that I am being given assignments that should delegated, but the Management will not support me delegating, I can no longer function and it is having a deleterious effect upon my mental health.

I work too hard in that store daily, around individuals who do not want to work, to never hear the words "good job," or "thank you." Instead of being thanked every day, I am being stalked for errors, and it is depressing. It is clear enough to me that the Management is looking for any reason to fire me, and the law does not require me to suffer month after month under the harassment, while they figure out the reasons. So, I hereby tender my resignation, and surrender the keys that have been entrusted to me.

Sincerely

Thomas C. Brooks, Jr.

**EXHIBIT A TO NOTICE OF REMOVAL**

STATE OF NEW YORK
CITY OF BROOKLYN
COUNTY OF KINGS

## VERIFICATION

Thomas C. Brooks, Jr, being duly sworn, states that he is the Plaintiff in this action and that the foregoing Complaint is true to his own knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters he believes it to be true.

Thomas C. Brooks, Jr

Sworn to before me this 14th day of
November, 2023

JENNIBA SILLA
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SI6297629
Qualified in Kings County
My Commission Expires 02-24-20__

11/14/23

**EXHIBIT A TO NOTICE OF REMOVAL**

Index No.                    Year 2023              Calendar No: 884/23

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF KINGS.

THOMAS C. BROOKS, JR.

v.

TAILORED SHARED SERVICES, LLC and MEN'S WEARHOUSE

### VERIFIED COMPLAINT

THOMAS C. BROOKS, JR.
*Pro Se* Plaintiff
10558 Avenue M, #2
Brooklyn, NY 11236
Ph: 347-782-2174 email: Brookstcjr@gmail.com

Service of a copy of the within Complaint is hereby admitted

Dated:

_____
Attorneys for

SIRS:  PLEASE TAKE NOTICE

NOTICE OF ENTRY

That the within is a (certified) true copy of a
duly entered in the office of the clerk of the within named court on                    2023

NOTICE OF SETTLEMENT

That an order                                    of which the within is a true copy will be presented for settlement to
the HON.

, one of the judges of the within named court, at
on                    2023,    at
DATED:

THOMAS C. BROOKS, JR.
*Pro Se* Plaintiff
10558 Avenue M, #2
Brooklyn, NY 11236
Fax: (347) 587-3334